938 A.2d 286

**DONEGAL MUTUAL INSURANCE COMPANY, Appellant**

**v.**

**Richard BAUMHAMMERS, Andrejs Baumhammers, Inese Baumhammers, May–Lin Kung, Administratrix of the Estate of Ji–Ye Sun, and May–Lin Kung in her own right, Sanford Gordon, Administrator of the Estate of Anita Gordan, and Sanford Gordan in his own right, Zetta Renee Lee, Administratrix of the Estate of Garry Lee, Jane/John Doe, Administrator of the Estate of Anil Thakur, Bang Ngoc Ngo, Administrator of the Estate of Thao Q. Pham, Sandip Patel, and United Services Automobile Association, Appellees.**

Supreme Court of Pennsylvania.

Argued March 5, 2007.

Decided Dec. 27, 2007.

148

150

Scott Alden Millhouse, Meyer, Darragh, Buckler, Babenek & Eck, P.L.L.C., Pittsburgh, for Donegal Mut. Ins. Co., appellant.

Paul Richard Walker, Thomas, Thomas & Hafer, L.L.P., Harrisburg, for PA Ass'n of Mut. Ins. Companies, appellant amicus curiae.

· William T. Salzer, Swartz Campbell, L.L.C., Philadelphia, for PA Defense Inst., et al., appellant amici curiae.

Stephen John Poljak, Richard Bruce Morrison, Marshall, Dennehey, Warner, Coleman & Goggin, P.C., Pittsburgh, for United Services Auto. Ass'n., appellee.

William R. Caroselli, Caroselli, Beachler, McTiernan & Conboy, L.L.C., Pittsburgh, for Sanford Gordon, appellee.

Christina Kaiser Hurnyak, Tarasi & Tarasi, P.C., Pittsburgh, for Sandip Patel, appellee.

Richard A. Baumhammers, appellee pro se.

James Joseph Ross, Bowers, Ross and Fawcett, L.L.C., Ambridge, for Zetta Renee Lee, appellee.

William R. Tighe, Richard B. Tucker, Tucker Arensberg, P.C., Pittsburgh, for Andrejs Baumhammers & Inese Baumhammers, appellees.

Charles A. Knoll, Vincler Knoll, P.C., for Bang Ngoc Ngo et al., appellees.

William Peter Chapas, Wallace, Barozzini, Harvey & Zimmaro, P.C., for May–Ling Kung, appellee.

Arthur L. Bugay, Galfand Berger, L.L.P., Philadelphia, for PA Trial Lawyers Ass'n, appellee amicus curiae.

Jacquelyn Jean Anger, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, for Greene Tweed & Co., Inc., Appellee amicus curiae.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice BALDWIN.

### *Facts and Procedural History*

Appellant, Donegal Mutual Insurance Company ("Donegal") asks this court to determine whether multiple shootings perpetrated by Richard Baumhammers ("Baumhammers"), an adult, resulting in the death of five individuals and serious bodily injury of a sixth, qualifies as an "accident" pursuant to Donegal's insurance policy, requiring Donegal to provide coverage to Andrejs and Inese Baumhammers, the parents of Richard Baumhammers. Donegal additionally asks this court to determine whether the alleged negligence of Andrejs and Inese Baumhammers and the subsequent shootings by their son constitute a single "occurrence" under Donegal's insurance policy or whether each shooting of the victims constituted a

separate occurrence. We affirm the Superior Court's decision that an "accident" happened, but reverse the Superior Court's finding that the instant facts support a finding of multiple occurrences.

On April 28, 2000, Baumhammers left his home and shot and killed his neighbor, Anita Gordon, at her home which he then set on fire. He then drove to Scott Township where he killed Anil Thakur and seriously wounded Sandip Patel, after which he drove to Robinson Township and shot and killed Ji-Ye Sun and Thao Pak Pam. Finally, Baumhammers drove to Center Township where he shot and killed Garry Lee. The entire series of events occurred within a two hour time period. On May 9, 2001, Baumhammers was convicted of first degree murder with respect to the five victims who had died, and aggravated assault and attempted homicide for the shooting of Patel.

Patel and the personal representatives of the estates of the deceased victims ("Plaintiffs") filed complaints against Baumhammers and his parents in the Court of Common Pleas of Allegheny County, consolidated at GD 00–10558. The complaints allege the following omissions by Parents: (1) failure to procure adequate mental health treatment for Baumhammers, (2) failure to take Baumhammers' handgun away from him, and (3) failure to notify the appropriate authorities of the fact that Baumhammers possessed a handgun. *Donegal v. Baumhammers*, GD 01–5671, GD 00–18199, slip op. at 6 (Ct. Com. Pleas of Allegheny Cty. Aug 7, 2002) ("Trial Court op.").[1]

Andrejs and Inese Baumhammers ("Parents") are insured under a homeowners policy issued by Donegal. The policy covers Parents as well as any relative residing in the household. Baumhammers resided in his parents' home at the time

1. The instant matter originally included a declaratory judgment action instituted by United Services Automobile Association (USAA) seeking a ruling that it had no duty to defend or indemnify Parents or Baumhammers in the actions filed by Plaintiffs. By order dated December 19, 2001 at GD 00–18199, the trial court granted a motion for summary judgment filed by USAA, declaring that USAA had no duty to defend or indemnify any of its insureds in the actions filed against them by Plaintiffs.

of the shooting incidents. The Donegal insurance policy provides coverage for claims brought against an insured for damages resulting from bodily injury caused by an "occurrence." R. 92. The policy describes its coverage limits for bodily injury as follows:

Limit of Liability. Our total liability ... for all damages resulting from any one "occurrence" will not be more than the limit of liability ... as shown in the Declarations. This limit is the same regardless of the number of "insureds," claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

R. 97, 118.

The limit of liability for personal injury under the Donegal policy is $300,000 per "occurrence." R. 118. The policy defines an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in ... [b]odily injury or [p]roperty damage." R. 81. The term "accident" is not defined in the policy. Pursuant to the policy, Donegal agreed to "[p]rovide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent." R. 93.

On March 22, 2001, Donegal filed a complaint for declaratory judgment requesting that the court enter a judgment that Donegal had no duty to defend or indemnify Baumhammers or Parents in the civil actions filed against them by Plaintiffs since the shootings were not accidental in nature but were the result of intentional conduct which the policy did not cover.[2]

---

2. Following the purchase of the insurance policy by Parents, Donegal made unilateral changes to the original policy. The original policy contained an intentional act exclusion which provided that bodily injuries expected or intended by "the insured" would not be covered. Donegal however changed the wording of this exclusion to exclude coverage for acts expected or intended by "one or more insured" and sent a notice to Parents highlighting this change and explaining that Donegal did not intend to change the coverage. The trial court con-

R. 106. Donegal additionally asserted, in the alternative, that if Baumhammers or Parents were entitled to have Donegal defend and potentially indemnify them, the shootings were the result of a single "occurrence." On September 6, 2001, Donegal filed a motion for summary judgment asserting that it was not required to defend or indemnify Baumhammers or Parents. Parents filed cross-motions for summary judgment requesting that the trial court find that Donegal was obligated to defend them and provide indemnification in the event that they are found to be negligent in the actions brought against them by Plaintiffs. Parents additionally asserted that the injuries to each of the individual plaintiffs constituted a separate and distinct "occurrence" for purposes of coverage.

By order dated December 19, 2001, the trial court granted Donegal's motion with respect to Baumhammers, declaring that Donegal had no duty to defend or indemnify him, and denied Donegal's motion with respect to Parents, determining that Donegal did have a duty to defend and indemnify Parents for six individual "occurrences." On June 6, 2002, following the grant of a motion for reconsideration filed by Donegal, the trial court reinstated its December 19, 2001 order.

On appeal, a panel of the Superior Court initially reversed the trial court's determination. That decision was withdrawn however and following re-argument *en banc*, the court affirmed the order of the trial court determining that Donegal was required to provide coverage to Parents and that Baumhammers' independent acts of shooting each individual victim resulted in six separate "occurrences" for purposes of coverage. This Court then granted Donegal's request for allowance of appeal.

### Discussion

 Preliminarily, we note that "[t]he interpretation of an insurance contract regarding the existence or non-existence

cluded that the policy must be read to provide the same coverage as originally purchased by Parents and therefore construed the intentional act exclusion in the Donegal policy such that it excluded coverage for injuries caused by acts expected or intended by "the insured." Trial Court op. at 11.

of coverage is 'generally performed by the court.'" *Minnesota Fire and Cas. Co. v. Greenfield*, 579 Pa. 333, 344, 855 A.2d 854, 861 (2004). "The interpretation of an insurance contract is a question of law, our standard of review is *de novo*, thus, we need not defer to the findings of the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 331, 908 A.2d 888, 893 (2006). Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. *401 Fourth Street, Inc. v. Investors Ins. Group*, 583 Pa. 445, 454, 879 A.2d 166, 171 (2005). "When the language of the policy is clear and unambiguous, we must give effect to that language." *Kvaerner*, 589 Pa. at 331, 908 A.2d at 897. However, "when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contracts prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage." *Id.*

In determining whether an insurance company is responsible to defend its insured, we observed in *Gene's Restaurant Inc. v. Nationwide Ins. Co.*, 519 Pa. 306, 308, 548 A.2d 246, 247 (1988) that:

> [a]n insurer's duty to defend an action against the insured is measured, in the first instance, by the allegations in the plaintiff's pleadings.... In determining the duty to defend, the complaint claiming damages must be compared to the policy and a determination made as to whether, if the allegations are sustained, the insurer would be required to pay resulting judgment.... [T]he language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation.

Therefore, "a carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage." *Mutual Benefit Ins. Co. v. Haver*, 555 Pa. 534, 538, 725 A.2d 743, 745 (1999).

■ To determine whether Donegal is obligated to defend and potentially indemnify parents in the instant case requires review of the factual allegations contained in the complaint. Plaintiffs allege that Parents acted negligently in failing to take possession of Baumhammers' gun and/or alert law enforcement authorities or mental health care providers about his dangerous propensities.[3] It is upon this assertion of negligence that Plaintiffs seek recovery against Parents. Therefore, we are asked to determine whether the alleged negligence of Parents and the injuries resulting therefrom qualify as an "accident" obligating Donegal to defend Parents.

Relying on our decision in *Gene's Restaurant*, Donegal asserts that the deaths and injury to the victims in the instant case were the direct product of Baumhammers' criminal conduct and injuries that result from intentional acts of wrongdoing do not qualify as "accidental" for purposes of coverage. In *Gene's Restaurant*, the insurance company refused to defend the insured restaurant against an allegation by a customer of willful and malicious assault. We reasoned that the assault against the customer was not an accident but an intentional tort. Because the insurance policy precluded recovery for intentional torts, we concluded that the insurer owed no duty to defend. *Gene's Restaurant*, 519 Pa. at 308, 310, 548 A.2d at 247.

Donegal argues that because Baumhammers was found, in a separate criminal proceeding, to have engaged in intentional criminal conduct, it is not required to defend Parents. While Donegal is correct that intentional conduct may not qualify as "accidental," the complaint in the instant case contains allegations of negligence on the part of the insured. Our conclusion in *Gene's Restaurant* that injuries caused by intentional conduct are not "accidental" does not absolve an insurer of the duty to defend its insured when the complaint filed against the

**3.** With respect to the complaints filed by Plaintiffs against Parents, there has been no determination as to whether Parents acted negligently. We do not reach the question of whether Donegal must indemnify Parents should there be a verdict against them, as the case has not progressed past the pleading stage; therefore, we will only address the duty to defend.

insured alleges that the intentional conduct of a third party was enabled by the negligence of the insured.[4] Therefore, in the instant case where Plaintiffs have asserted negligence on the part of the insured, our holding in *Gene's Restaurant* is not dispositive. Instead, we find applicable our rationale in *Mohn v. Am. Casualty Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974) and the Third Circuit decision in *Nationwide Mutual Fire Ins. Co. v. Pipher*, 140 F.3d 222 (3d. Cir.1998).

While the facts in *Mohn* are somewhat different, the analysis is applicable to the instant case. In *Mohn*, the dependent son of the insured was shot and wounded by police while attempting to flee from the scene of a burglary that he was in the process of committing. The injury to insured's son ultimately resulted in his death, and the insured sought reimbursement from his insurer for the expenses incurred as a result of his son's hospitalization. We determined that the decedent sustained an "accidental" bodily injury specifying that "the fact that the event causing the injury may be traceable to an intentional act of a third party does not preclude the occurrence from being an 'accident.'" *Mohn*, 458 Pa. at 579, 326 A.2d at 348. We further observed in *Mohn* that "the test of whether injury is a result of an accident is to be determined from the viewpoint of the insured and not from the viewpoint of the one that committed the act causing the injury." *Id.*

In *Pipher*, the insured who owned a rental unit failed to install doors on the second floor apartment of the property before leasing it to a tenant. The tenant was murdered in the apartment and the spouse of the decedent brought an action against the insured property owner raising numerous allegations of negligence. The insurance company sought a declaration that because the victim's death was caused by the intentional acts of a third party, no "accident" or "occurrence" had occurred and therefore Nationwide had no duty to defend or indemnify its insured. The Third Circuit reasoned however

4. We use the term "third party" to indicate that Richard Baumhammers is a third party with respect to the suit brought by Plaintiffs against Parents.

that an insurance company has a duty to defend its insured against complaints alleging negligent conduct on the part of the insured and that although a third party may have intentionally injured or killed the plaintiff, the death or injury may still be deemed to be an accident under the terms of the policy. *Pipher,* 140 F.3d at 225–26. In the instant case, as in *Pipher* and *Mohn,* we agree with the Superior Court that our case law requires Donegal to defend Parents against Plaintiffs' claims of negligence even where that alleged negligence may have led to the intentional acts of a third party.

■■■ To determine whether Donegal has a duty to defend its insured in the actions brought by Plaintiffs it is necessary for this Court to examine whether the injuries that are the impetus of the action were caused by an "accident" so as to constitute an occurrence under the policy. The Donegal homeowners insurance policy provides no definition of the term "accident." However, we have established that the term "accident" within insurance polices refers to an unexpected and undesirable event occurring unintentionally, and that the key term in the definition of the "accident" is "unexpected" which implies a degree of fortuity. *Kvaerner,* 589 Pa. at 333, 908 A.2d at 898. An injury therefore is not "accidental" if the injury was the natural and expected result of the insured's actions. *See Lower Paxton Twp. v. U.S. Fidelity and Guar. Co.,* 383 Pa.Super. 558, 567, 557 A.2d 393, 398 (1989) ("[An] [a]ccident is an event that takes place without one's foresight or expectation. It is an undesigned, unexpected event. The term accident within the meaning of an insurance policy is an event happening by chance unexpectedly taking place. It is the opposite of something likely to occur, foreseeable in due course."). *See also Minnesota Fire and Cas. Co. v. Greenfield,* 579 Pa. 333, 359, 855 A.2d 854, 870 (2004) (" 'Accident' has been defined in the context of insurance contracts as an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens.") (citations omitted).

This Court has previously addressed whether the circumstances leading to an injury qualify as "accidental" for purposes of insurance coverage. In *Kvaerner*, this Court was asked to determine whether an insurance company was obligated to defend and indemnify its insured against an allegation of "property damage" caused by the insureds defective workmanship. In determining whether claims of defective workmanship constituted an "occurrence," and therefore an "accident" pursuant to the policy, we concluded that the definition of "accident" could not be satisfied by claims based upon faulty workmanship since such claims did not present the degree of fortuity contemplated by the definition of the term "accident." *Kvaerner*, 589 Pa. at 333, 908 A.2d at 898. In *Pipher*, the Third Circuit was asked to determine whether the death of a tenant following the failure of the insured property owner to install doors on the apartment constituted an "accident" for purposes of coverage. Reasoning that from the perspective of the insured, the death of the tenant was unexpected and entirely fortuitous, the Court held the injury to the victim constituted an accident entitling the insured property owner to coverage. *Pipher*, 140 F.3d at 226.

In the instant case, as in *Kvaerner* and *Pipher*, we are required to determine whether, from the perspective of the insured, the claims asserted by Plaintiffs present the degree of fortuity contemplated by the ordinary definition of "accident." We hold that they do. The extraordinary shooting spree embarked upon by Baumhammers resulting in injuries to Plaintiffs cannot be said to be the natural and expected result of Parents alleged acts of negligence. Rather, Plaintiffs' injuries were caused by an event so unexpected, undesigned and fortuitous as to qualify as accidental within the terms of the policy. Because the alleged negligence of Parents resulted in the tragic accidental injuries to the individual plaintiffs, Donegal is therefore required to defend Parents.

 Our next inquiry is whether, under the Donegal insurance policy, the injuries to the six individual victims constituted six separate "occurrences" or one single "occurrence" in order to ascertain the limits of liability coverage.

There are two key competing approaches for determining the number of occurrences for purposes of liability: (1) the "cause" approach, and (2) the "effects" approach. The prevailing view looks to the "cause" or "causes" of the damage to determine the number of occurrences. *Nicor, Inc. v. Associated Elec. and Gas Ins. Services Ltd.,* 223 Ill.2d 407, 419, 307 Ill.Dec. 626, 860 N.E.2d 280, 287 (2006). Courts that employ this "cause" theory consider whether there is a single cause or multiple causes for the losses sustained. Conversely, courts that employ the "effects" approach calculate the number of occurrences by looking to the effect of the accident or, in other words, how many individual claims or injuries resulted therefrom. The "effects" approach has been applied by a minority of courts.[5]

Although this Court has not addressed the issue, our appellate courts have consistently concluded that the "cause" theory represents the approach that the courts of this Commonwealth should follow. In order to properly understand the cause of loss theory as interpreted and applied in Pennsylvania, it is

5. *See Heggem v. Capitol Indem. Corp.,* 336 Mont. 429, 438, 154 P.3d 1189, 1195 (2007) ("In interpreting the term 'occurrence' as used in liability policies ... the vast majority of courts view it from the perspective of causation-referring to the cause or causes of the damage or injury-and not the number of injuries or claims."); *Owners Ins. Co. v. Salmonsen,* 366 S.C. 336, 339, 622 S.E.2d 525, 526 (2005) ("The majority rule in interpreting the meaning of 'occurrence' in a liability policy is the so-called 'cause test' which focuses on the cause of the damage rather than the number of claimants or injuries. The minority view, on the other hand, focuses on the effect of the insured's action and considers each event or each injury a separate occurrence."). *See also Metropolitan Life Ins. Co. v. Aetna Cas. and Sur. Co.,* 255 Conn. 295, 314, 765 A.2d 891, 901 (2001); *Greengo v. Public Employees Mut. Ins. Co.,* 135 Wash.2d 799, 814, 959 P.2d 657, 664 (1998). *United States Fire Ins. Co. v. Safeco Ins. Co.,* 444 So.2d 844, 847 (Ala.1983); *Olsen v. Moore,* 56 Wis.2d 340, 346, 202 N.W.2d 236, 239 (1972); *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.,* 351 N.C. 293, 304, 524 S.E.2d 558, 565(2000).; *Nicor, Inc. v. Associated Elec. and Gas Ins. Services Ltd.,* 223 Ill.2d 407, 420, 307 Ill.Dec. 626, 860 N.E.2d 280, 287 (2006); *Koikos v. Travelers Ins. Co.,* 849 So.2d 263, 269 (Fla.2003); *Travelers Indem. Co. v. Olive's Sporting Goods, Inc.,* 297 Ark. 516, 522, 764 S.W.2d 596, 599 (1989); *Bish v. Guaranty Nat. Ins. Co.,* 109 Nev. 133, 135, 848 P.2d 1057, 1058 (1993); *Arizona Property and Cas. Ins. Guar. Fund v. Helme,* 153 Ariz. 129, 137, 735 P.2d 451, 457 (1987).

necessary to consider the principal appellate court cases in which this doctrine has been employed.

In *D'Auria v. Zurich Ins. Co.*, 352 Pa.Super. 231, 507 A.2d 857 (1986), the Superior Court was asked to determine whether the failure of a physician to diagnose and later treat a condition, which resulted in his patient suffering from renal failure, qualified as a single "occurrence." The Superior Court, relying on the Third Circuit's analysis in *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3d. Cir. 1982), adopted the cause of loss test to determine the number of occurrences present. Reasoning that the physician's misdiagnosis and mishandling of his patient was the cause of the renal failure, the court concluded that for purposes of insurance coverage, only one occurrence had occurred, declining to divide the doctor's initial failure to diagnose and subsequent failure to treat into multiple occurrences.

In *General Accident Ins. Co. of Am. v. Allen*, 708 A.2d 828 (Pa.Super.Ct.1998), the Superior Court was asked to determine the extent of the insurer's obligation to defend and indemnify in a tort case where the insured, Eugene Allen, was accused of abusing three minor children and his wife, Elizabeth Allen, was accused of allowing the abuse to happen or failing to take steps to prevent it. The court noted that the controlling approach to determining the number of occurrences lay in the application of the "cause" approach, and reasoned that with respect to Elizabeth Allen the injury to the three minor children was caused by her failure to prevent the sexual abuse and that her negligence therefore constituted one "occurrence" under the policy. *Allen*, 708 A.2d at 834.

We agree with the Superior Court's adoption of the "cause" approach for determining what constitutes an "occurrence" pursuant to an insurance policy. In the instant case, applying the "cause" test, the Superior Court concluded that Parents' allegedly negligent acts resulted in six distinct attacks on six individuals which constituted six separate "occurrences." In reaching its determination, the Superior Court found persuasive the rationale of the Florida Supreme Court in *Koikos v. Travelers Ins. Co.*, 849 So.2d 263 (Fla.2003). In *Koikos* the

Florida court reasoned that where the insured owned a restaurant in which an individual shot several victims, the "occurrence" should be defined by the immediate injury-producing act and not by the underlying tortuous omission. Accordingly, the court concluded that the immediate causes of the injuries were the intervening intentional acts of the shooter and therefore each shooting constituted a separate occurrence. The court found no merit to the insurance company's argument that the injuries to the victims were the result of their exposure to the harmful condition created by the restaurant owner's negligence in failing to keep his property safe, opting instead to focus on the immediate cause of the damage rather than the underlying negligence of the insured. *Koikos*, 849 So.2d at 271–72.

Relying on *Koikos*, the Superior Court in the instant case reasoned that Parents' liability was not triggered until their negligence led to Baumhammers' shooting rampage. Therefore, the court concluded that Baumhammers' independent acts of shooting each of his victims constituted the immediate injury-producing act and that the alleged negligence of Parents resulted in six distinct attacks on six individuals. We disagree with the application of the cause approach adopted by the Superior Court in the instant case and the Florida court in *Koikos*, and conclude instead that to determine the number of "occurrences" for which an insurance company is to provide coverage, the more appropriate application of the cause approach is to focus on the act of the insured that gave rise to their liability.

In *Washoe County v. Transcontinental Ins. Co.*, 110 Nev. 798, 878 P.2d 306 (1994), numerous children brought an action against Washoe County for negligently licensing a daycare center at which an employee sexually abused the children over a three year period. In determining the number of "occurrences" for which the county's insurance company was required to provide indemnification, the court reasoned that where the insured is not accused of direct or vicarious responsibility for the actual misconduct of another but is accused of some inaction or inadequate action, even though the actions of

an individual wrongdoer are the most direct causes of harm for the victims, the action of the individual wrongdoer taken alone is not the basis of liability. Instead, the Nevada court reasoned that liability was premised on the insureds negligence in performing a duty, which permitted the intervening conduct of those who actively caused the victims harm. Therefore, the court explained "the focus of the inquiry should not be on the number, magnitude, or time of the injuries, but rather on the cause or causes of the injury." *Washoe*, 110 Nev. at 801, 878 P.2d at 308. The court reasoned that as long as the injuries stemmed from one proximate cause there is a single occurrence, and that because each of the separate instances of molestation arose from the same proximate cause, i.e. the County's alleged negligence, that negligence constituted a single occurrence for purposes of liability. *Id.*

We find the rationale of the Nevada Supreme Court persuasive. Parents liability in the instant case is premised on their negligence in failing to confiscate Baumhammers' weapon and/or notify law enforcement or Baumhammers' mental health care providers of his unstable condition. Because coverage is predicated on Parents' inaction, and the resulting injuries to the several victims stem from that one cause, we hold that Parents' alleged single act of negligence constitutes one accident and one occurrence.

We are not alone in this decision. Courts in other jurisdictions have reached the same conclusion in similar cases. In *Bomba v. State Farm Fire & Casualty Co.*, 379 N.J.Super. 589, 879 A.2d 1252 (2005), a case factually similar to the instant matter, the son of the insured shot two police officers multiple times. The police officers subsequently sued the insured parents for negligently keeping firearms in their home and negligently supervising their son. *Bomba*, 379 N.J.Super. at 592, 879 A.2d at 1253. The New Jersey Superior Court reasoned that applying the "cause" approach, the only cause that would support coverage for the police officers' claims was the negligence of the insured. The court noted that if the action of the gunman was the cause of the injuries, then the officers' claims would fail by virtue of the policy's exclusion for

intentional or criminal acts. The court thus concluded that there was only one occurrence cognizable under the insurance policy, namely the negligence of the gunman's parents. *Id.* at 596, 879 A.2d at 1255.

In *RLI Ins. Co. v. Simon's Rock Early College,* 54 Mass. App.Ct. 286, 765 N.E.2d 247 (2002), a student of Simon's Rock College embarked on a shooting rampage resulting in the death of two individuals and injury to four others. In a negligence action brought against the college, the court reasoned that in determining the cause of the injuries, the focus was on the cause or occurrence giving rise to insurance coverage. Since the underlying claims against the college were for its allegedly negligent act or omission in failing to prevent the shooter from using his gun, the court concluded that the college's negligence constituted the "occurrence" for purposes of determining liability under the policy. Noting that the issue to be determined was not liability, but the contractual obligation of the insurer to the insured, the Massachusetts court observed that "since the policy was intended to insure the college for its liabilities, the occurrence should be an event over which the college had some control. Otherwise, with the covered risks out of the insured's hands and coverage for losses determined by the acts of the unfettered shooter, the insurer would have no basis for setting premiums *ex ante* and the insurance contract would be illusory." *RLI,* 54 Mass. App.Ct. at 290, 293, 765 N.E.2d at 251, 253. *See also Travelers Indem. Co v. Olive's Sporting Goods Inc.,* 297 Ark. 516, 764 S.W.2d 596 (1989) (where victims of a shooting spree brought a claim against an insured sporting goods store for negligently selling firearms to the gunman, the court reasoned that to conclude that each of the injuries required separate coverage under the policy would put a no-limit policy into effect and held that there was only one occurrence within the meaning of the insurance policy); *Home Indem. Co. v. City of Mobile,* 749 F.2d 659 (11th Cir.1984) (finding that the intervening negligence of the insured constituted the occurrence that created the liability and that the term "occurrence" did

not refer to the damages sustained by each individual plaintiff).

Determining the number of occurrences by looking to the underlying negligence of the insured recognizes that the question of the extent of coverage rests upon the contractual obligation of the insurer to the insured. Since the policy was intended to insure Parents for their liabilities, the occurrence should be an event over which Parents had some control. *See RLI*, 54 Mass.App.Ct. at 293, 765 N.E.2d at 252. Parents' alleged negligence in failing to remove Baumhammers weapon and/or alerting the authorities as to his dangerous propensities is the "occurrence" that began the sequence of events that resulted in the eventual injuries to Plaintiffs. In this case, the fact that there were multiple victims does not determine the limits of Parents liability coverage; the number of occurrences does. Although this is a disturbing case with tragic consequences, we are compelled to conclude that Parents' alleged negligence constituted but a single "occurrence" for purposes of coverage under the Donegal insurance policy. Thus, we reverse the Superior Court's finding that Donegal is required to provide coverage for six separate occurrences.

Justices CASTILLE, SAYLOR and EAKIN join the opinion.

Chief Justice CAPPY files a concurring and dissenting opinion.

Justice BAER files a concurring and dissenting opinion.

Chief Justice CAPPY concurring and dissenting.

I join the majority conclusion on the issue of coverage, agreeing that under the insurance policy ("Policy") issued by Donegal Mutual Insurance Company ("Donegal"), the claims made against Adrejs and Inese Baumhammers (the "Baumhammers") are for damages resulting from bodily injuries caused by an "occurrence." I dissent, however, as to the majority's conclusion that there was a single occurrence for which coverage is provided.

First, I write to re-emphasize that at this point in time, we address whether Donegal must provide a defense to the Baumhammers, not whether the Baumhammers are legally liable for the claims made against them and Donegal must pay. The liability, if any, of the Baumhammers for the actions of their adult child implicates several issues, which include whether the Baumhammers owed a duty of care to the plaintiffs. The question of legal duty will involve a weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1169 (2000). But this, along with the other elements of the claims made against the Baumhammers, are questions for another day.

My dissent as to the number of covered occurrences is premised on my view that the majority incorrectly shifts perspective when it counts how many occurrences there were once it concludes that the events at issue did indeed constitute an occurrence for which there is coverage. As to coverage, the majority examines the definition of an "occurrence" in the Policy, focuses on Richard Baumhammers' violent acts, and determines that an accident, which qualifies as a covered occurrence under the Policy, took place because those acts were unexpected by the insureds. But then, to count the number of occurrences, the majority shifts its focus to the omissions of the Baumhammers that are alleged to be negligent, and states that "[b]ecause coverage is predicated on the Baumhammers' inaction, and the resulting injuries to the several victims stem from that one cause, we hold that Parents' alleged single act of negligence constitutes one accident and one occurrence." (Majority opinion at 163, 938 A.2d at 295.). This is inconsistent.

I would hold that the question of the number of occurrences, like the question of whether there was an occurrence, is to be determined with a focus on Richard Baumhammers' acts.

That is to say, I would count the number events that were unexpected by the Baumhammers. In this regard, I would adopt the analysis set forth in the well-reasoned opinion of the Florida Supreme Court in *Koikos v. Travelers Ins. Co.*, 849 So.2d 263 (Fla.2003). In *Koikos*, the Court adopted the "cause" test, focusing on the immediate acts that caused bodily injury, and counted the number of occurrences, *i.e.*, accidents, from the standpoint of the insured. *Id.* at 271. With this approach in mind, in the present case, I would conclude that there were six occurrences for which the Policy provides coverage.[1]

For these reasons, I concur with the majority that the Policy provides coverage, but respectfully dissent from the majority's conclusion that there was only one occurrence. I would conclude that there were six covered occurrences and thus, would affirm the Superior Court's decision in its entirety.

Justice BAER concurring and dissenting.

I join my colleagues in concluding that the Baumhammers' alleged negligence triggered Donegal Mutual Insurance Company's obligation to defend and potentially indemnify the insureds. In contrast to my fellow justices, I conclude that the horrific events in this case constitute neither one nor six "occurrences" under the terms of the insurance policy.[1] In-

1. I also point out that *Koikos* aptly emphasizes the numerous ways in which insurance companies can limit liability in this area when they draft insurance contracts by using clear language, and highlights the well-settled principle of strictly construing insurance contracts against the drafter, which has long been followed in Pennsylvania. *Id.* at 272. *See Miller v. Boston Ins. Co.* 420 Pa. 566, 218 A.2d 275, 277 (1966).

1. The insurance policy at issue contained the following language:

Limit of Liability. Our total liability ... for all damages resulting from any one "occurrence" will not be more than the limit of liability ... as shown in the Declarations. This limit is the same regardless of the number of "insureds," claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

Reproduced Record (R.R.) at 97. "Occurrence," in turn, is defined as an "accident, including continuous or repeated exposure to substantial-

stead, I would hold that the four distinct events triggered four "occurrences:" the shooting and fire in Mt. Lebanon, the Scott Township shooting, the Robinson Township shooting, and finally the shooting in Center Township.

After considering my colleagues' well-reasoned expositions as well as numerous decisions across the nation interpreting similar clauses, I find the policy provision in question ambiguous as to what constitutes a single "occurrence." The pertinent provision in the Donegal policy fails to include language definitively indicating that multiple related events constitute a single occurrence. *See Koikos v. Travelers Ins. Co.*, 849 So.2d 263, 272 (Fla.2003) (referencing policies which include in the definition of occurrence "a series of related events"). Additionally, neither the policy's use of the word "accident" nor, as explained below, its reference to repeated exposure does anything to clarify the number of occurrences in the instant case. Accordingly, I conclude that the definition of "occurrence" in Donegal's policy is ambiguous. Under our longstanding case law, we must interpret ambiguous language in insurance policies in favor of the insured and against the insurance company as drafter of the provision. *Standard Venetian Blind Co. v. Amer. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983).

To interpret the provision, the obvious starting point in the quantification of "occurrences" is the policy definition of the term as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in . . . [b]odily injury or [p]roperty damage." R.R. at 81. In some cases, such as torts arising from exposure to toxic materials such as asbestos, the phrase "continuous exposure to substantially the same general harmful conditions" effectively limits the number of exposures found. The same language, however, has little utility in negligent supervision cases such as the one before us. In a case involving insurance coverage for negligent supervision of

ly the same general harmful conditions, which results, during the policy period, in: a. 'Bodily injury'; or b. 'Property damage.' " R.R. at 81.

a priest, Judge Easterbrook of the Seventh Circuit opined on the application of a repeated exposure provision:

It assumes a two-party perspective—that an insured tortfeasor has harmed a victim. Its language is a mismatch for a case in which the tort is negligent supervision of an intentional wrongdoer. "[C]ontinuous or repeated exposure to conditions" sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys. A priest is not a "condition" but a sentient being, and of course the victim was never "exposed" to the Diocese's negligent supervision.

*Lee v. Interstate Fire & Cas. Co.,* 86 F.3d 101, 104 (7th Cir.1996). In this case, Richard Baumhammers is not a condition and the victims were never exposed to his parents' negligent supervision. Accordingly, the repeated exposure clause should not control.

As ably presented by the Majority, one interpretation of the occurrence provision is that the number of "occurrences" in cases of negligent supervision is the number of negligent acts of the insured, in this case the parents' failure to supervise. Respectfully, I must reject this conclusion because it fails to account for the second half of the occurrence definition relating to the infliction of bodily injury or property damage, which is also a prerequisite to every action for negligence. The absence of either a negligent act or an injury results in no coverage, either because the policy coverage would not be triggered absent the negligence act of the parents, or because, pragmatically, there would be no need for coverage if there were no injuries. If the Baumhammers had carelessly supervised their son and no one had been harmed as a result, there would be no actionable conduct to be covered by the insurance policy. Thus, the negligent act in and of itself cannot constitute an occurrence absent subsequent injury or property damage.

While the Majority discusses the Superior Court's decisions in *D'Auria v. Zurich Insurance Co.,* 352 Pa.Super. 231, 507 A.2d 857 (1986), and *General Accident Insurance Co. of America v. Allen,* 708 A.2d 828 (Pa.Super.1998), I find these

cases inapt. In quantifying the number of occurrences, the point of conflict in both *D'Auria* and *Allen* relates to the first half of the definition of occurrence, because both cases involved numerous negligent acts. In *D'Auria*, the alleged negligent conduct involved a physician's repeated misdiagnosis of a patient's ailment, while in *Allen*, the negligent acts related to a woman's repeated failure to protect children entrusted to her care from her pedophilic spouse. In contrast, the parties in this case do not dispute the number of negligent acts,[2] but instead disagree regarding the application of the occurrence provision where there are numerous injuries.[3]

A second method of quantifying the ambiguous term "occurrence," as set forth in Chief Justice Cappy's dissent, derives from the total number of victims. I find this conclusion compelling because it acknowledges that a completed act of negligence requires both a breach of a duty of care and an injury. Moreover, it correlates to the potential number of tortious actions that could be brought against the insured. However, that interpretation results in the unenforceability of one sentence of the same limits of liability provision. The policy clearly provides, "This limit is the same regardless of the number of 'insureds,' claims made[,] or persons injured." If the number of occurrences is always determined by the number of victims, then this unambiguous limit can never be applied, a conclusion that cannot be consistent with the parties' intent. Accordingly, I am forced to reject this interpreta-

2. The negligent act in this case is the alleged negligent supervision of Richard Baumhammers by his parents, specifically the (1) failure to obtain adequate mental health treatment, (2) failure to secure his gun, and (3) failure to notify authorities of the danger he posed. The Baumhammers and the victims in this case have not argued for three occurrences based on the allegations of negligence but instead have asserted six occurrences based on the number of victims that resulted from the shooting spree.

3. Additionally, the outcome in *Allen* does not support the Majority's conclusion that the number of occurrences is dependent on the number of negligent acts because while the court in *Allen* found that the repeated failures of the wife constituted a single continuous act of negligence, the court nonetheless found one "occurrence" for each of the three children.

tion because I believe it conflicts with the language of the policy.

Instead, I would combine the two approaches, thus accounting for both the negligent act and the bodily injuries, while acknowledging that the number of injured per occurrence is irrelevant to the limit of liability. A finding of an occurrence would require a pairing of both a negligent act of an insured, in this case the parents' negligent supervision, and an injury, in this case the six shootings. However, to account for the unambiguous language rebuking the equation of number of occurrences with the number of victims, I employ the cause theory, as interpreted by other courts, to require consideration of whether there is "but one proximate, uninterrupted, and continuing cause which resulted in all the injuries and damage." *See Allen,* 708 A.2d at 833; *D'Auria,* 507 A.2d at 860; *H.E. Butt Grocery Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 150 F.3d 526, 534 (5th Cir.1998); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56, (3d Cir.1982). Under this interpretation, only one occurrence would result if multiple victims are injured in a single event, but separate occurrences result if there are separate events.[4] For example, one occurrence would result if the negligence of the insured resulted in a tortfeasor detonating a single bomb, whether that bomb injured one or five hundred people because the injury or injuries resulted from one uninterrupted cause. In contrast, in considering the facts of the case at bar, each of the stops on Richard Baumhammers rampage constituted a separate event uniting of an allegedly negligent act and, crucially, an injury, triggering a completed act of negligence and therefore, a new occurrence under the terms of the policy. Accordingly, I would find one occurrence relating to the Mt. Lebanon death of Anita Gordon, a second occurrence consisting of the shooting of Anil Thakur and Sandip Patel in Scott Township, a third occurrence in Robinson Township where Ji–

---

4. Additionally, equating occurrences with events does not conflict with the repeated exposure clause discussed above. Indeed, because that clause provides that exposure to one continuous cause triggers but one occurrence, logically, the absence of a single continuous cause should result in multiple occurrences.

Ye Sun and Thao Pak Pam were killed, and a fourth occurrence in Center Township which caused the death of Gary Lee. Thus, I conclude that four occurrences resulted from the events.