**[J-31-2019] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| ERIE INSURANCE EXCHANGE, | : | No. 20 WAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court entered November |
| | : | 22, 2017 at No. 869 WDA 2016, |
| v. | : | vacating the Judgment of the Court |
| | : | of Common Pleas of Washington |
| | : | County entered June 15, 2016 at |
| TRACY L. MOORE AND HAROLD E. | : | No. 2014-4931 and remanding. |
| MCCUTCHEON, III, INDIVIDUALLY AND | : | |
| AS ADMINISTRATORS OF THE ESTATE | : | ARGUED:  April 11, 2019 |
| OF HAROLD EUGENE MCCUTCHEON, | : | |
| JR., AND RICHARD A. CARLY, | : | |
| | : | |
| Appellees | : | |

## DISSENTING OPINION

**JUSTICE MUNDY**                                **DECIDED:  APRIL 22, 2020**

In this case, we are called upon to determine whether the allegations in a civil complaint filed by Richard A. Carly (the Carly complaint) against the estate of Harold E. McCutcheon, Jr. constitute an "occurrence" as contemplated by the relevant insurance policies and, if so, whether the exclusionary provisions of the policies preclude coverage. In my view, the factual allegations of the complaint, fairly read, cannot be reasonably interpreted as an occurrence so to qualify for coverage under the terms of the insurance policies.  Accordingly, I dissent.

At the relevant time, Erie Insurance Exchange (Erie) insured McCutcheon, under two policies, the HomeProtector Ultracover Insurance Policy (Homeowner's Policy) and the Personal Catastrophe Liability Policy Mastercover (Personal Catastrophe Policy). Each policy provides coverage for bodily injury or property damage resulting from an

"occurrence." The policies each define an "occurrence" primarily, as "an accident." *See* Homeowner's Policy at 5; Personal Catastrophe Policy at 3. The Personal Catastrophe Policy continues that in order to qualify as an "occurrence" the harm resulting from the "accident" must be "neither expected nor intended." Personal Catastrophe Policy at 3. Both policies contain exclusionary provisions that exclude from coverage injury or damages "expected or intended" by the insured.[1] *See* Homeowner's Policy at 15; Personal Catastrophe Policy at 4.

It is undisputed that "the obligation of a casualty insurance company to defend an action brought against the insured is to be determined *solely* by the allegations of the complaint in the action . . . ." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006) (citing *Wilson v. Maryland Casualty Co.*, 105 A.2d 304, 307 (Pa. 1954)). Accordingly, "whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint." *American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 541 (Pa. 2010). Thus, it is necessary to undertake an examination of the Carly complaint and the policies to determine whether the Carly complaint states a claim that may potentially be covered under the terms of the policies.

The Carly complaint included the following allegations:

> 5. On or about September 26, 2013, Harold Eugene McCutcheon, Jr. (decedent) notified his children, Tracy L. Moore, and Harold E. McCutcheon, III, by a written note that he was going to the home of his former wife, Terry L. McCutcheon . . . to kill her and then commit suicide.

---

[1] The Homeowner's Policy further provides coverage is excluded for damages "expected or intended by anyone we protect even if: a. the degree, kind or quality of the injury or damage is different than what is expected or intended; or b. a different person, entity, real or personal property sustained the injury or damage than was expected or intended." Homeowner's Policy at 15.

6. That prior to the incident occurring on September 26, 201[3], . . . Terry L. McCutcheon had been to the residence of Richard A. Carly . . . since they had been dating.

7. On September 26, 201[3], shortly before 11:00 p.m., Terry L. McCutcheon left the home of the Plaintiff, Richard A. Carly, and proceeded to her residence . . . .

8. That prior to Terry L. McCutcheon arriving at her residence, decedent had broken into her home and was waiting for her in order to shoot and kill Terry L. McCutcheon, and then commit suicide thereafter.

9. That after leaving the home of the Plaintiff, Richard A. Carly, Terry L. McCutcheon arrived at her home . . . at around 10:55 p.m.

10. On September 26, 2013, around 10:55 p.m., Terry L. McCutcheon made a cell phone call from her residence to Plaintiff, Richard A. Carly, to express to him that she had arrived at her home, and during the conversation, the call was terminated unexpectedly.

11. That [Carly] believes that the decedent approached Terry while she was on the phone talking to [Carly] in order to kill her.

12. Sometime during or after the call made by Terry L. McCutcheon to Richard A. Carly on September 26, 2013, decedent physically assaulted Terry L. McCutcheon and then shot her twice in the upper torso causing her death. This occurred on the main floor where her bedroom was located.

13. After said phone call had been discontinued, Richard A. Carly attempted to reach Terry L. McCutcheon by calling her back, but received no answer.

14. That as a result of not being able to reach Terry L. McCutcheon by telephone, Plaintiff, Richard A. Carly, drove to [Terry's residence] from his residence to talk to Terry L. McCutcheon. He arrived at Terry's residence at about 11:45 p.m.

15. On September 26, 2013, at approximately 11:45 p.m., the Plaintiff, Richard A. Carly, approached the front door to the

residence of Terry L. McCutcheon and rang the doorbell a couple times but received no answer.

16. That as a result of receiving no answer, [Carly] became concerned and put his hand on the doorknob of the front door in order to enter and the door was suddenly pulled inward by decedent who grabbed the Plaintiff by his shirt and pulled him into the home.

17. At the time that decedent pulled [Carly] into the home, decedent was screaming, swearing, incoherent, and acting "crazy."

18. That once [Carly] was inside the home, a fight ensued between the two and at the time, decedent continued to have the gun in his hand, which gun decedent apparently had shot and killed Terry L. McCutcheon, and was going to use to commit suicide.

19. That a struggle ensued between decedent and [Carly] thereby knocking things around, and in the process decedent negligently, carelessly, and recklessly caused the weapon to be fired which struck [Carly] in the face inflicting the injuries and damages as are more fully hereinafter set forth.

20. That during the struggle, [Carly] believes that other shots were carelessly, negligently and recklessly fired by the decedent striking various parts of the interior of the residence and exiting therefrom.

21. All of the injuries and damages sustained by the Plaintiff, Richard A. Carly, were solely and wholly, directly and proximately caused by the negligence, carelessness and recklessness of the decedent, Harold Eugene McCutcheon, Jr., as follows:

a. In carelessly and recklessly causing a firearm to discharge thereby striking [Carly].

b. In failing to regard the safety and well being of [Carly] and engaging in reckless conduct.

c. In evidencing a reckless disregard for the safety of [Carly].

d. In recklessly discharging a firearm.

e. In breaching a duty of care decedent owed to [Carly].

f. In failing to appreciate and realize that there was a strong probability of harming [Carly] and using conduct that created an unreasonable risk of physical harm to [Carly].

g. In negligently tossing his arm around in which hand the gun was contained thereby recklessly shooting off various rounds in and about the room where [Carly] and decedent were struggling, one such round striking [Carly].

h. In being mentally disturbed to the extent that decedent needed or was undergoing mental treatment at the time.

i. In possibly being under the influence of alcohol and/or drugs at said time.

…

Carly Lawsuit Compl., 2/20/14, at 2-6.

I cannot agree with the Majority that the "'four corners of the complaint'" — when taken as true and liberally construed — make out an accidental shooting." Majority Opinion at 12. An "occurrence" in the context of insurance policies is defined relevantly as "accident." In clarifying the term "accident" under insurance policies, this Court has referred to the common usage of the word. We explained, "Webster's II New College Dictionary 6 (2001) defines 'accident' as '[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.' The key term in the ordinary definition of 'accident' is 'unexpected.' This implies a degree of fortuity[.]" *Kvaerner*, 908 A.2d at 897-98. *See also Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 292 (Pa. 2007) (explaining "the term 'accident' within insurance policies refers to an unexpected and undesirable event occurring unintentionally, and that the key term in the definition of 'accident' is 'unexpected' which implies a degree of fortuity."). Likewise, Black's Law Dictionary defines "accident," in part, as "[a]n unintended and unforeseen

injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated[.]" *Black's Law Dictionary* (11th ed. 2011), *available at* Westlaw BLACKS. Accordingly, for an event to constitute an insurable "occurrence" it must be unintended and occur unexpectedly. Moreover, the event must carry with it some degree of fortuity. Conversely, an event is not an occurrence if the result was expected by the insured, even if the specific injury was unintended.

Applying those principles, the allegations in the Carly complaint, plainly fail to allege an "occurrence," which would compel Erie to defend McCutcheon's estate against Carly's lawsuit. Indeed, and specifically, the Carly complaint alleged that Carly arrived at Ms. McCutcheon's home and proceeded to "put his hand on the doorknob of the front door" at which time he "was suddenly pulled inward by [McCutcheon] who grabbed [Carly] by his shirt and pulled him into the home." *Id.* at ¶ 16. Once McCutcheon pulled Carly into the home, a struggle ensued between McCutcheon and Carly during which the weapon was fired causing the injury to Carly. *Id.* at ¶ 19. Reading the Carly complaint, as a whole, the discharge of the gun under the circumstances causing injury to Carly cannot reasonably be interpreted as an unexpected or fortuitous event that would trigger Erie's duty to defend.

It is true that Carly alleges that McCutcheon, "negligently, carelessly, and recklessly caused the weapon to be fired[,]" and other shots were "carelessly, negligently and recklessly fired by" McCutcheon "striking various parts of the interior of the residence[.]" Carly Lawsuit Compl., 2/20/14, at ¶¶ 19-20. However, the legal characterizations of conduct in a complaint are not determinative, and cannot be employed to compel an insurer to defend where the factual allegations otherwise would

not trigger coverage. *See Mutual Ben. Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)[2] (concluding, "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead, it is necessary to look at the factual allegations contained in the complaint."). We are tasked with looking at the facts, not speculating about scenarios that are inconsistent with common sense or experience.

The facts are clear: while in the process of effecting a murder-suicide, McCutcheon physically pulled Carly into the home, engaged in a physical struggle with Carly, while he, the aggressor, held and discharged a firearm. As this Court has recognized, an insurer is not obligated to defend against such intentional tortious conduct. *See Gene's Restaurant, Inc. v. Nationwide Mut. Ins. Co.*, 548 A.2d 246, 247 (Pa. 1988) (holding, "[t]he willful and malicious assault alleged in the complaint is not an accident but rather is an intentional tort. As such, it is not covered by the policy and, therefore, the insurer owed no duty to defend."). Moreover, other than characterizing the events in the legal terms "negligently, carelessly and recklessly," there are no descriptive terms within the four corners of this complaint that describe the events as those in the nature of an accident. In fact, the word "accident" does not appear in the complaint.

What further distinguishes my view from the Majority's is that, under the facts alleged in the complaint, there is no occurrence alleged to justify insurance coverage *even if* the gunshot wound itself was unintended by McCutcheon. That is so because an "occurrence" must not merely be unintended but *unexpected*. As explained, the Carly complaint cannot be reasonably read in a way that suggests that McCutcheon did not expect this injury to occur. *See* Carly Lawsuit Compl., 2/20/14, at ¶ 21 (acknowledging that McCutcheon "us[ed]" conduct that created an unreasonable risk of physical harm to

---

[2] Unlike the Majority, I find the underpinnings of *Haver* to bear precisely on the issues before this Court.

[Carly].").  This is not, as the Majority suggests, an impermissible inference.  *See* Majority Opinion at 13.  To view purely the discharge of the weapon, without reference to the context, is contrary to our precedent that requires us to view the complaint as a whole.

The Majority does not appear to distinguish its analysis with respect to whether there was an occurrence from whether the occurrence was excluded by the terms of the policies' respective exclusionary clauses.  However, clearly, the exclusionary provisions of these policies further preclude coverage.  In *American National Property and Casualty Co. v. Hearn*, 93 A.3d 880 (Pa. Super. 2014), there was no dispute the insured intentionally struck his friend intending only to cause brief pain.  *Hearn*, 93 A.3d at 882, 885.  The injured, however, experienced extreme pain and swelling, had to undergo emergency surgery, and testing revealed the possibility of permanent infertility as a result. *Id.* at 882.  The intermediate court found the exclusionary clause barred insurance coverage, as "it is clear from the undisputed facts that Hearn's assault on [his friend] was intentional." *Id.* at 886.  Because there was no question that Hearn did not intend to cause a serious injury when he struck his friend, the Superior Court addressed its holding in *United Servs. Auto Ass'n v. Elitzky*, 517 A.2d 982 (Pa. Super. 1986).  In this case, the Majority notes that under *Elitzky*, the insured must possess some conscious awareness of the injury in order for coverage to be excluded.  Majority Op. at 5, n. 3.  Indeed, *Elitzky* held, "[i]nsurance coverage is not excluded because the insured's actions were intentional unless he also intended the resultant damage." *Elitzky*, 517 A.2d 987 (citation omitted). However, the *Hearn* court recognized that the exclusionary clause at issue barred coverage for an intentional act even if the harm is different than expected or intended. *See Hearn*, 93 A.3d at 886.

The Homeowner's Policy and the Catastrophic Liability Policy at issue both exclude expected or intended damage.  Further, the Homeowner's Policy here, as in

*Hearn*, explicitly excludes coverage for injury "expected or intended by anyone we protect even if . . . the degree, kind or quality of the injury or damage is different than what is expected or intended[.]" Homeowner's Policy at 15. The discharge of a weapon during a physical altercation initiated by the insured, while the insured is holding a firearm, is the type of harm specifically excluded under the policy.

In my view, artful pleadings cannot form the basis of imposing a duty to defend. As the discharge of the firearm under the circumstances alleged in the Carly complaint does not carry with it the degree of fortuity or unexpectedness necessary to constitute an accidental occurrence, I cannot agree Erie is obligated to afford coverage under the terms of the insurance policies. I respectfully dissent.

Chief Justice Saylor and Justice Todd join this dissenting opinion.