PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3705
_____

THE HANOVER INSURANCE COMPANY

v.

URBAN OUTFITTERS, INC.; U.O.COM, LLC;
URBAN OUTFITTERS WHOLESALE, INC.;
ANTHROPOLOGIE, INC; ANTHROPOLOGIE.COM, LP;
FREE PEOPLE OF PA, LLC; FREEPEOPLE.COM, LLC,

v.

ONEBEACON AMERICA INSURANCE COMPANY

Urban Outfitters, Inc.; UO.com, LLC; Urban Outfitters
Wholesale, Inc.; Anthropologie, Inc.; Anthropologie.com,
L.P.; Free People of PA, LLC; Freepeople.com, LLC;
OneBeacon America Insurance Company,
Appellants

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-12-cv-03961)

District Judge: Honorable Thomas N. O'Neill, Jr.

———————————

Argued March 3, 2015

Before: AMBRO, SCIRICA and ROTH, <u>Circuit Judges</u>

(Opinion filed: October 23, 2015)

Ilan Rosenberg, Esq.                    **(ARGUED)**
Jacob C. Cohn, Esq.
Gordon & Rees
2005 Market Street
Suite 2900
Philadelphia, PA 19103

Dorothy A. Hickok, Esq.
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square
Suite 2000
Philadelphia, PA 19103

             Counsel for Appellants

Andrew J. Gallogly, Esq.          **(ARGUED)**
Margolis Edelstein
170 South Independence Mall West
The Curtis Center
Suite 400E
Philadelphia, PA 19106

             Counsel for Appellee

## OPINION

ROTH, Circuit Judge

The "prior publication" exclusion of liability insurance contracts prevents a company from obtaining ongoing insurance coverage for a continuing course of tortious conduct. In this appeal, we consider the scope of the "prior publication" exclusion.

## I.

On February 28, 2012, in the U.S. District Court in New Mexico, the Navajo Nation and its affiliates (collectively Navajo Nation) sued Urban Outfitters and its affiliates (collectively Urban Outfitters) for trademark infringement and related common law and statutory violations. Navajo Nation's central allegation was that Urban Outfitters "advertised, promoted, and sold its goods under the 'Navaho' and 'Navajo' names and marks" on the Internet and in retail

stores "[s]ince at least March 16, 2009."[1]  Urban Outfitters tendered the complaint to OneBeacon America Insurance Company and Hanover Insurance Company.

OneBeacon provided commercial general liability and umbrella liability coverage to Urban Outfitters prior to July 7, 2010.  The Insuring Agreement specifically included "personal and advertising injury" coverage.[2]  On July 7, 2010,

---

[1] On September 19, 2014, after years of discovery and three amended complaints, the District Court in New Mexico dismissed Urban Outfitters' counterclaim seeking a judicial declaration that Navajo Nation's federally registered NAVAJO trademarks are invalid and therefore subject to cancellation.  On March 23, 2015, the U.S. Court of Appeals for the Tenth Circuit denied permission for interlocutory appeal.  Currently pending before the District Court in New Mexico are various motions and cross-motions, including motions for summary judgment.

[2] "Personal and advertising injury" was defined in the policy, in pertinent part, as

> (2) Oral or written publication, in any manner, of material that disparages a person's or organization's goods, products or services.
>
> This does not include any disparagement related to the actual or        alleged infringement or violation of any intellectual property rights        or laws;
>
> e. Oral or written publication of material that violates a person's right of privacy;
>
> f. The use of another's advertising idea in your "advertisement"; or

OneBeacon issued a "fronting policy"[3] to Urban Outfitters providing identical coverage for which Hanover served as the responsible insurer. The policy was in effect from July 7, 2010, to July 7, 2011. Hanover subsequently issued separate commercial general liability and umbrella liability policies to Urban Outfitters, which were effective from July 7, 2011, to July 7, 2012. The "fronting policy" and Hanover-issued policies excluded coverage for "personal and advertising injury" liability "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period."[4]

On April 26, 2012, two months after Navajo Nation filed the trademark infringement suit, Hanover provided a reservation of rights letter, informing Urban Outfitters of Hanover and OneBeacon's joint retention of defense counsel. On July 12, 2012, Hanover sought a judicial declaration in the U.S. District Court for the Eastern District of Pennsylvania that it was not responsible for Urban Outfitters' defense or indemnification. On August 19, 2013, the District Court granted Hanover's motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c).

---

       g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

[3] A "fronting policy" is a risk management technique in which an insurer underwrites a policy to cover a specific risk but then cedes the risk to a reinsurer. *See* Douglas R. Richmond, *Getting a Fix on Fronting Policies*, 31 No. 19 Ins. Litig. Rep. 629 (2009). Here, the fronting company is One Beacon and the reinsurer is Hanover.

[4] *See* J.A. at 198, 224.

The District Court held that Hanover had no duty to defend or indemnify since Hanover did not begin insurance coverage of Urban Outfitters until sixteen months after the alleged infringement began. The District Court found that, because the claims in the underlying action alleged injuries stemming from advertisements published prior to the policy inception date, any resulting injury fell within the Hanover policies' "prior publication" exclusions.[5] We dismissed an initial appeal for lack of appellate jurisdiction.[6] However, the District Court has since addressed our jurisdictional concern by entering final judgment for Hanover on its August 19, 2013, Order, pursuant to Rule 54(b). Urban Outfitters and Third Party Defendant, OneBeacon, now appeal that order.

## II.[7]

"We review *de novo* an order granting judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure."[8] "[I]n reviewing the grant of a Rule 12(c) motion, we must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."[9] Under Pennsylvania law, which Hanover and Urban Outfitters agree governs,

---

[5] *Hanover Ins. Co. v. Urban Outfitters*, No. 12-cv-3961, 2013 WL 4433440, at *5 (E.D. Pa. Aug. 19, 2013).

[6] *Hanover Ins. Co. v. Urban Outfitters Inc.*, 572 F. App'x 91, 93 (3d Cir. 2014).

[7] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

[8] *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 751 F.3d 150, 156 n.11 (3d Cir. 2014).

[9] *Id.* at 154 n.4 (quotation marks omitted).

6

"[t]he interpretation of an insurance policy is a question of law that we will review *de novo*."[10]

## III.

Urban Outfitters contends that the District Court erred in finding that Navajo Nation's trademark infringement allegations fall under the Hanover policies' "prior publication" exclusions. Both sides acknowledge an absence of binding authority, and urge us to derive antithetical lessons from the few cases on point. For the reasons which follow, we will affirm the District Court's decision.

## A.

In interpreting an insurance contract,

[o]ur inquiry is straightforward. We look first to the terms of the policy which are a manifestation of the "intent of the parties." [*Donegal Mut. Ins. Co. v.*] *Baumhammers*, 938 A.2d [286,] 290 [(Pa. 2007)]. "When the language of the policy is clear and unambiguous, we must give effect to that language." *Id.* . . . Next, we compare the terms of the policy to the allegations in the underlying claim. "It is well established that an insurer's duties under an insurance policy are triggered by the language of the complaint against the insured." *Kvaerner*, 908 A.2d at 896. In

---

[10] *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006).

> determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured.[11]

An insurer that disavows its duty to defend by reference to a policy exclusion effectively "assert[s] an affirmative defense and, accordingly, bears the burden of proving such defense."[12]

The Hanover policies' "personal and advertising injury" provisions clearly and unambiguously cover Urban Outfitters' alleged trademark infringement and related common law and statutory violations.[13] Nonetheless, Hanover contends that it has no duty to defend since its policies specifically excluded coverage for "personal and advertising injury" liability "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." The "fronting policy" under which Hanover first assumed responsibility for Urban Outfitters' liability coverage became effective on July 7, 2010. Thus, we must determine whether Urban Outfitters' liability-triggering conduct preceded or postdated that policy period's inception.

---

[11] *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 595-96 (3d Cir. 2009) (footnote and, in final sentence only, citation and quotation marks omitted).

[12] *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999).

[13] *See supra* note 2.

The answer lies entirely within the four corners of the underlying complaint.[14] There Navajo Nation alleged that Urban Outfitters engaged in "trademark infringement, trademark dilution, unfair competition, false advertising, commercial practices laws violations, and [] violation of the Indian Arts and Crafts Act,"[15] but offered little specificity as to when the offensive conduct occurred. Navajo Nation's relevant allegations are as follows:

> 2. Since at least March 16, 2009, Urban Outfitters has advertised, promoted, and sold its goods under the "Navaho" and "Navajo" names and marks. Urban Outfitters offers these goods on the Internet and in stores across the United States, and they compete directly with the Navajo Nation's goods.[16]
>
> ***
>
> 37. At least as early as March 16, 2009, Urban Outfitters started using the

---

[14] *See Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290-91 (Pa. 2007); *Erie Ins. Exch. v. Fidler*, 808 A.2d 587, 590 (Pa. Super. Ct. 2002) ("The obligation of an insurer to defend an action against the insured is fixed solely by the allegations in the underlying complaint.").

[15] J.A. at 748. All citations to Navajo Nation's complaint refer to the First Amended Complaint, which governed when Hanover filed the declaratory judgment action presently on appeal. Subsequent amendments do not substantively alter any relevant allegations.

[16] J.A. at 749.

"Navajo" and "Navaho" names in its product line, or in connection with the sale of its goods, online, in its catalogs, and in its physical stores. Defendant's use has included, and includes (but is not limited to): clothing, jewelry, footwear, handbags, caps, scarves, gloves, undergarments, and flasks. Defendant's items sold under the "Navajo" and "Navaho" names and marks evoke the Navajo Nation's tribal patterns, including geometric prints and designs fashioned to mimic and resemble Navajo Indian-made patterned clothing, jewelry and accessories. Urban Outfitters has sold and is selling over 20 products using the "Navajo" and "Navaho" trademarks in its retail stores, its catalogs, and its online stores.[17]

\*\*\*

41. Urban Outfitters began offering retail clothing and accessories as early as March 2009 with the "Navajo" and "Navaho" as trademarks to label or describe its products. For example, a "Leather Navajo cuff" was offered on Urban Outfitters' website in January 2010. Sometime in early 2011, and possibly earlier, Urban Outfitters started a product line of 20 or more items containing the NAVAJO trademark, which Defendant sold on its website and in retail stores. True and correct copies of Defendants' more than 20 items comprising the

---

[17] J.A. at 759.

"Navajo Collection" sold at Urban Outfitters, as they are or have been displayed for online marketing and retailing at Defendant's website, are attached hereto collectively as Exhibit A. [FN 5] Exhibit A is an illustrative, and not exhaustive, list of Urban Outfitters infringing activity. Indeed, Exhibit A only includes screen shots from online shopping websites. Urban Outfitters sold its goods in physical stores and in catalogs, and this has also infringed on the Navajo Nation's marks.

[FN 5] These PDF images were copied from Defendant's website on October 16, 2011. [18]

\*\*\*

78.    At least since March 16, 2009, and possibly earlier as discovery will confirm, and continuously thereafter to the present date, Defendant has advertised, marketed, offered, displayed for sale, and sold goods in manners that falsely suggested they are Indian-made, an Indian product, a product of an Indian Tribe, or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of jewelry and clothing in a traditional Indian style, printed design, or medium.[19]

---

[18] J.A. at 760-61.
[19] J.A. at 772.

Citing a lack of chronological specificity in Navajo Nation's allegations, Urban Outfitters urges us to use extrinsic evidence to determine whether Hanover owes a duty to defend. We decline for two reasons. First, and most importantly, Pennsylvania law provides that the determination of a duty to defend depends on the language of the policy and the allegations of the complaint[20] -- not on extrinsic evidence.

Second, the premise underpinning Urban Outfitters' advocacy of extrinsic evidence is misguided. A complaint that features few details as to when the plaintiff was wronged is far from exceptional. On the contrary, allegations more chronologically cryptic than Navajo Nation's frequently form the basis of advertising injury claims.[21] To abandon the underlying complaint whenever a plaintiff neglects to provide a date-certain tortious conduct timeline would occasion more protracted disputes by eroding the predictability that reliance on a single pleading ensures.[22]

Confining our review to the contents of the underlying complaint, we find Navajo Nation's description of Urban Outfitters' allegedly infringing conduct remarkably

---

[20] *See Baumhammers*, 938 A.2d at 290-91.

[21] *See, e.g.*, *Transp. Ins. Co. v. Pa. Mfrs.' Ass'n Ins. Co.*, 346 F. App'x 862, 863 (3d Cir. 2009); *Maddox v. St. Paul Fire & Marine Ins.*, 179 F. Supp. 2d 527, 528-29 (W.D. Pa. 2001); *Applied Bolting Tech. Prods., Inc. v. U.S. Fidelity & Guar. Co.*, 942 F. Supp. 1029, 1031-32 (E.D. Pa. 1996).

[22] It might be another matter if the facts known to the insurer and those alleged in the complaint were in conflict. But since neither insurer alleges such a factual conflict here, we decline to opine on that decidedly more difficult scenario.

consistent. Thus, according to Navajo Nation, Urban Outfitters advertised goods in a manner violative of its trademark

- "[s]ince at least March 16, 2009" (¶ 2);
- "[a]t least as early as March 16, 2009" (¶ 37);
- "as early as March 2009" (¶ 41); and
- "[a]t least since March 16, 2009, and possibly earlier as discovery will confirm, and continuously thereafter to the present date" (¶ 78).

In each instance, Navajo Nation fixed March 16, 2009 (if not earlier) as a start date for Urban Outfitters' alleged misconduct. Under the terms of the Hanover policies' "prior publication" exclusions, we must treat this date of "first publication" as a landmark.[23] Because Hanover was not responsible for Urban Outfitters' liability insurance coverage until sixteen months thereafter, the exclusions apply—that is, unless the underlying complaint contains allegations of "fresh wrongs" that occurred during Hanover's policy periods.

**B.**

There is no binding authority in this Court on what constitutes a "fresh wrong." The Ninth Circuit Court of Appeals, however, recently considered the question on analogous facts. In *Street Surfing, LLC v. Great American E & S Insurance Co.*, the court defined "fresh wrongs" as "new matter," which in turn "is material not 'substantially similar'

---

[23] *See, e.g.*, *Applied Bolting*, 942 F. Supp. at 1036.

13

to the material published before the coverage period."[24] The court emphasized that "courts have not considered *all* differences between pre-coverage and post-coverage publications, but have focused on the relationship between the alleged *wrongful acts* manifested by those publications. A post-coverage publication is 'substantially similar' to a pre-coverage publication if both publications carry out the same alleged wrong."[25]

The insurer in *Street Surfing* was excused from its duty to defend despite differences in pre- and post-coverage advertisements. Although the ads featured different products, the advertising idea was the same regardless of the product: the products all used the allegedly infringing identification "Street Surfing." The Ninth Circuit held that the post-coverage ads were not "fresh wrongs" because (1) the underlying plaintiff did not "allege that the post-coverage advertisements were separate torts occurring during the policy period" and (2) the advertisements "arose out of each term's similarity to [plaintiff's] advertising idea."[26]

We find this approach persuasive but we will attempt to build on it. Under Pennsylvania law, "[a]n insurer's duty to defend is broader than its duty to indemnify."[27] However, reasonable limits may be imposed on that broad duty, as for instance in cases of alleged advertising harm. There, the prior

---

[24] *See Street Surfing, LLC v. Great Am. E & S Ins. Co.*, 776 F.3d 603, 612 (9th Cir. 2014).
[25] *Id.* at 612-13.
[26] *Id.* at 614.
[27] *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010).

14

publication exclusion serves to limit the coverage for an ongoing course of wrongful conduct. Nevertheless, if a new infringement has superseded the original infraction, the insurers (and courts) must distinguish between "fresh wrongs" and mere variations on a theme.

As with the duty to defend, the allegations in the underlying complaint control.[28] Where a plaintiff alleges a substantive difference between allegedly infringing advertisements, published before and during the relevant policy period, the later advertisements are "fresh wrongs" that fall outside the "prior publication" exclusion. But variations, occurring within a common, clearly identifiable advertising objective, do not give rise to "fresh wrongs."

When a purported advertising violation stems from such common, clearly identifiable objectives, the "prior publication" exclusion applies to excuse an insurer from its duty to defend if that insurer has assumed coverage responsibility after the insured has commenced the liability-triggering conduct. In determining whether two or more sets of advertisements share a common objective, courts may look to whether the plaintiff charged the insured with separate torts or an agglomeration.[29] Other significant, factors include whether the complaint describes a significant lull between pre- and post-coverage advertising initiatives and whether the

---

[28] *See Baumhammers*, 938 A.2d at 290-91.
[29] *See Street Surfing*, 776 F.3d at 614.

15

advertisements share a common theme relating to the alleged violation.[30]

Urban Outfitters stands accused of an apparently continuous string of trademark infringement and related violations. In the underlying complaint, where Navajo Nation affixed dates to Urban Outfitters' purported misconduct, the dates were generally accompanied by qualifiers denoting continuity (e.g., Urban Outfitters has infringed "since" or "[a]t least as early as" March 2009). Navajo Nation provided more chronological specificity only in describing particular Urban Outfitters advertisements which fit the alleged pattern of infringement. Thus, it alleged, "[f]or example," that Urban Outfitters offered certain infringing products on its website in January 2010 and in retail stores as well "[s]ometime in early 2011, and possibly earlier."[31] Navajo Nation attached screen shots of the later product line as an exhibit to its complaint, but cautioned that it was "an illustrative, and not exhaustive, list of Urban Outfitters infringing activity."[32]

We may not infer from Navajo Nation's attachment of only post-coverage advertisements as exhibits that those advertisements substantively differed from pre-coverage ads.

---

[30] The Seventh Circuit has analyzed the "prior publication" exclusion under a different framework. *See Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1072-74 (2004). To the extent *Taco Bell* requires that pre- and post-coverage advertisements be identical (or nearly identical) for the "prior publication" exclusion to apply, we disagree that the exclusion demands such rigor.

[31] *See supra* note 17.

[32] *Id.*

In fact, taking Navajo Nation's complaint as true compels the opposite conclusion.[33] Navajo Nation did not charge Urban Outfitters with committing separate torts before and during Hanover's coverage period. Nor did it hint at a hiatus in Urban Outfitters' tortious pursuits between March 2009 and the complaint's filing. Navajo Nation alleged that Urban Outfitters "started using the 'Navajo' and 'Navaho' names" via all relevant instrumentalities of infringement (use "in its product line, or in connection with the sale of its goods, online, in its catalogs, and in its physical stores") well before Hanover's coverage period commenced.[34] Moreover, the "Leather Navajo cuff" offered on Urban Outfitters' website in January 2010 (six months before Hanover's coverage period

---

[33] Similarly, we reject Urban Outfitters' suggestion that, because Navajo Nation's allegations "lump defendants together and are insufficiently specific to determine the precise allegations directed against each individual defendant," the court must inquire further as to "the precise claims *against each insured*." In the very first sentence of its complaint, Navajo Nation alleges that it "brings this Amended Complaint against Urban Outfitters, Inc., and its wholly-owned and controlled subsidiaries, entities, and retail brands (collectively 'Urban Outfitters' or 'Defendant')." J.A. at 748. Urban Outfitters accurately contends that Navajo Nation did not distinguish thereafter between the various defendants, but that is precisely the point: Navajo alleged that each Urban Outfitters affiliate engaged in the same course of wrongful conduct. It is not our task to discern the plausibility of Navajo Nation's allegations. On the contrary, we are required to take them at face value. *See Baumhammers*, 938 A.2d at 290-91.

[34] *See supra* note 16.

began) appears thematically consistent with the more than twenty post-coverage advertising examples Navajo Nation identified.[35]

It is apparent from Navajo Nation's complaint that Urban Outfitters' advertisements, which predated Hanover's coverage period, share a common objective with those that followed. Thus, we conclude that the latter ads are not "fresh wrongs." The "prior publication" exclusions apply, and Hanover has no duty to defend Urban Outfitters in the underlying action.

## IV.

Risk is a concept with which we are intimately acquainted.[36] Those who wager correctly are rewarded and those who guess wrong suffer losses. The purpose of insurance is to disperse that risk. But "[a]n insured cannot insure against something that has already begun and which is known to have begun."[37] The "prior publication" exclusion prevents a continuing tortfeasor from passing the risk for its misconduct on to an unwitting insurer. Taking Navajo Nation's underlying allegations as true, Urban Outfitters engaged in similar liability-triggering behavior both before

---

[35] *See* J.A. at 786-809.

[36] As early as the sixteenth century, popular English proverbs cautioned of risk and its vagaries in terms familiar to present usage. *See, e.g.*, Adam Fox, *Oral and Literate Culture in England, 1500-1700*, 140-41 (2000).

[37] *See Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 716 (S.D. Tex. 2000) (citation and quotation marks omitted).

and during Hanover's coverage period.  We therefore hold that the exclusion applies.

For the foregoing reasons, we will affirm the District Court's order granting Hanover's motion for judgment on the pleadings.