**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1285**

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY

              Plaintiff - Appellee

v.

BEACH MART, INC.

              Defendant - Appellant

and

L&L WINGS, INC.

              Defendant

Appeal from the United States District Court for the Eastern District of North Carolina, at Elizabeth City. Terrence W. Boyle, Chief District Judge. (2:14-cv-00008-BO)

Argued: May 7, 2019                           Decided: August 1, 2019

Before KEENAN, WYNN, and FLOYD, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Judge Floyd joined.

**ARGUED:** Stephen Forest Shaw, WOMBLE BOND DICKINSON (US) LLP, Greensboro, North Carolina, for Appellant. Michael Duane Jones, HEDRICK GARDNER KINCHELOE & GAROFALO, LLP, Charlotte, North Carolina, for Appellee. **ON**

**BRIEF:** Charles A. Burke, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellant.  David L. Levy, HEDRICK GARDNER KINCHELOE & GAROFALO, LLP, Charlotte, North Carolina, for Appellee.

WYNN, Circuit Judge:

In this appeal, Pennsylvania National Mutual Casualty Insurance Company ("Penn National") contends that it has no duty to defend its insured, Beach Mart, Inc. ("Beach Mart"), in an underlying lawsuit against L&L Wings, Inc. ("L&L"). Penn National argues that its duty to defend was eliminated by the "prior publication" exclusions in the insurance policies, which preclude an insured from obtaining coverage for injuries caused to third parties through continuous conduct that began prior to coverage. The district court agreed but for the reasons that follow, we reverse and remand.

I.

To resolve this issue of whether Penn National has a duty to defend Beach Mart in the underlying lawsuit against, L&L. we look to: (A) L&L's pleadings in the underlying action, and (B) the insurance policies that Penn National issued to Beach Mart.

A.

In September 2011, Beach Mart brought the underlying action against L&L in the United States District Court for the Eastern District of North Carolina to determine who could use the WINGS trademark. L&L answered the complaint and asserted several counterclaims, including claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Beach Mart subsequently amended its complaint, and L&L in turn amended its answer and reasserted its counterclaims for breach of contract and

3

breach of the implied covenant of good faith and fair dealing.[1] For purposes of this appeal, the factual allegations supporting L&L's counterclaims and amended counterclaims are taken as true. *See, e.g., Bain v. Unitrin Auto & Home Ins. Co.*, 708 S.E.2d 410, 413 (N.C. Ct. App. 2011). Those allegations are materially indistinguishable, so we jointly discuss them below.

L&L and Beach Mart each operate retail stores that sell beach apparel in beachfront communities. Since 1978, L&L has continuously operated and marketed its stores under the WINGS trademark, and in 2008, it registered that mark with the United States Patent and Trademark Office for use in "retail apparel stores; retail clothing stores; [and] retail discount store services in the field of beachwear clothing." J.A. 663.

Prior to 1995, L&L employed Israel Golassa to work in its retail stores. But on January 1, 1995, Golassa left L&L to found Beach Mart. That same day, L&L and Beach Mart executed a one-year agreement wherein L&L licensed the WINGS mark to Beach Mart for use in two North Carolina stores "to sell beach-related apparel, beach toys, souvenirs and other related items under the WINGS trademark." J.A. 664, 788. At the end of the year, the parties reached an oral understanding that allowed Beach Mart to continue using the mark for an annual fee. That oral licensing agreement continued "for a number of years," but at some point, Beach Mart refused to pay for the WINGS mark yet continued to use it without L&L's authorization. J.A. 664, 789.

---

[1] Initially, L&L also asserted trademark infringement and unfair competition counterclaims, but the district court dismissed those claims as a discovery sanction. *See Beach Mart, Inc. v. L&L Wings, Inc.*, 302 F.R.D. 396, 416 (E.D.N.C. 2014). L&L additionally raised declaratory judgment counterclaims in its amended answer.

Thereafter, L&L and Beach Mart "negotiated a resolution" pertaining to Beach Mart's use of the mark, which was "memorialized in the 2005 Agreement, dated August 29, 2005." J.A. 664, 789. Under the 2005 Agreement, Beach Mart acknowledged that L&L owned the WINGS mark and any goodwill associated with it. Beach Mart also agreed that it would not use WINGS on a standalone basis after December 31, 2005. In exchange, L&L authorized Beach Mart to use the mark in several North Carolina counties, but only in the form BIG WINGS or SUPER WINGS.

According to L&L's complaint, "[s]ubsequent to December 31, 2005," Beach Mart breached the 2005 Agreement in two principal ways. J.A. 666, 790. First, Beach Mart used WINGS alone, and thus without the SUPER or BIG designations required by the 2005 Agreement. For example, Beach Mart did not include BIG or SUPER on its WINGS hang tags, sales receipts, discount coupons, or internet advertising. Beach Mart's employees also answered store calls with "Hello, Wings." J.A. 666, 790. Second, Beach Mart sometimes used the SUPER designation, but it did so in such a way that was virtually undetectable and therefore contrary to the 2005 Agreement. Thus, on its signs, SUPER was "so small that it [was] not observable by customers, especially after dark [because] the WINGS trademark . . . illuminated, but the word [SUPER did] not." J.A. 667, 791. Beach Mart "similarly diminished the size of the word [SUPER], to the extent it [was] used at all, in connection with merchandise labels and advertising so that it [was] possible only upon careful up-close inspection to see that the word [SUPER was] even being used." J.A. 667, 791.

5

In addition to allegedly infringing upon the WINGS trademark, L&L claimed that Beach Mart "further breached its duty to act in good faith and deal fairly by undermining the distinctiveness of [Beach Mart] and [L&L] as intended by the 2005 Agreement." J.A. 672, 799. Specifically, Beach Mart "adopted the advertising slogan — 'All you need for the beach' — which is virtually identical to [L&L's] slogan — 'All you need to reach the beach.'" J.A. 667–68, 791–92. According to L&L's complaint, Beach Mart also "construct[ed] and operat[ed] retail stores that use[d] the identical façade as [L&L's] stores, which use a triangular tower above the entry and a distinctive wave sign." J.A. 667, 791.

Citing these alleged breaches of contract and covenant, L&L sent Beach Mart a letter on August 9, 2011, terminating the 2005 Agreement effective October 21, 2011. L&L complains that, notwithstanding this termination letter, Beach Mart has allegedly continued to unlawfully use the WINGS mark and its goodwill.

B.

On January 1, 2008, Penn National issued two commercial insurance liability policies to Beach Mart: a Businessowner Policy and an Umbrella Policy. Both policies were delivered in North Carolina and provided coverage for one year. The parties annually renewed the policies in 2009, 2010, and 2011.

Under both policies, Penn National agreed to be liable for those damages that Beach Mart became obligated to pay because of "personal injury" or "advertising injury." Penn National also agreed to defend Beach Mart in any suit seeking such damages. As pertinent here, the Businessowner Policy defines "advertising injury" as an "injury arising out of . . . [m]isappropriation of advertising ideas or style of doing business; or [i]nfringement of

6

copyright, title, or slogan." J.A. 82. And the Umbrella Policy defines "personal and advertising injury" as an injury arising out of "[i]nfringing upon another's copyright, trade dress, or slogan[.]" J.A. 503.

Both policies include two relevant exclusions to coverage. First, the policies exclude coverage for injuries arising "out of the infringement of . . . trademark." J.A. 117, 492. Under the plain language of the policies, however, that "exclusion does not apply to infringement . . . of . . . slogan." J.A. 117, 493. Second, the policies include a prior publication exclusion, which precludes coverage for injuries "[a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period[.]" J.A. 77, 492.

In June 2012, Beach Mart requested that Penn National defend and indemnify it against L&L's counterclaims in accordance with its insurance policies. According to Beach Mart, it spent the next seven months attempting to convince Penn National that the underlying lawsuit constituted a covered event. Ultimately, in January 2013, Penn National appointed an attorney to defend Beach Mart, while also reserving its rights under the policies.

In February 2014, Penn National filed this declaratory judgment action, seeking a declaration of non-coverage under the policies. But before responsive pleadings were due, the district court stayed this action from May 2014 to September 2017. After the stay was lifted, in October 2017, Penn National amended its complaint. The same day, Beach Mart finally answered Penn National's complaint and asserted state-law counterclaims for

7

breach of contract, unfair and deceptive practices, and bad faith, each of which rested on Penn National's alleged failure to honor its contractual duty to defend.

In December 2017, Penn National moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). Penn National argued that, even assuming L&L's pleadings in the underlying lawsuit otherwise alleged a covered injury, Penn National nevertheless did not have a duty to defend Beach Mart because the prior publication exclusions in the policies precluded coverage. The district court agreed and, in an order dated March 6, 2018, held that Penn National had no duty to defend. *See Penn. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, No. 2:14-CV-8-BO, 2018 WL 1178004, at \*3 (E.D.N.C. Mar. 6, 2018).

According to the district court, the policies' prior publication exclusions eliminated coverage for injuries "arising from actions which first occurred prior to the policy period," which "did not become effective until January 1, 2008." *Id.* Examining L&L's pleadings, the court determined that Beach Mart "used WINGS on a stand-alone basis continually from January 1, 1995, and SUPER WINGS continually from January 1, 2006." *Id.* Such use became "offensive . . . at a minimum when Beach Mart ceased paying fees to L&L . . . for use of the mark . . . prior to the parties' agreeing to terms of use of the WINGS trademark in the 2005 Agreement." *Id.* at \*3–4. Because this "offensive conduct began outside the coverage period," and continued "over time without any meaningful interruption," the court held that the prior publication exclusions applied and that Penn National had no duty to defend. *Id.*

8

The district court recognized that some of L&L's allegations were not premised upon Beach Mart's infringing use of the WINGS trademark. For example, L&L had also alleged that Beach Mart used almost identical "advertising slogans" and "building façades" as used in L&L's stores. *Id.* at \*4. Nevertheless, the court viewed all of these alleged wrongs as "substantially similar" and part of a "common, clearly identifiable advertising objective" that did "not give rise to 'fresh wrongs' which would trigger coverage." *Id.* (quoting *Hanover Ins. Co. v. Urban Outfitters, Inc.*, 806 F.3d 761, 768 (3d Cir. 2015)). Accordingly, Penn National had no duty to defend Beach Mart.

Because the district court determined that Penn National had no duty to defend, it also held that Penn National had not breached the insurance agreements, acted in bad faith, or engaged in unfair or deceptive acts and practices. Therefore, the court also dismissed Beach Mart's counterclaims. Beach Mart timely appealed.

## II.

"We review de novo the district court's ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)[.]" *Butler v. United States*, 702 F.3d 749, 751 (4th Cir. 2012). "In reviewing the grant of a Rule 12(c) motion, we must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Hanover*, 806 F.3d at 764; *see Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014) (drawing "all reasonable factual inferences" in favor of the nonmovant).

The Businessowner and Umbrella Policies each exclude coverage for injuries "[a]rising out of oral or written publication of material whose first publication took place

9

before the beginning of the policy period[.]" J.A. 77, 492. Beach Mart contends that the district court erred in applying these prior publication exclusions to eliminate Penn National's duty to defend in the underlying cause of action.[2]

We agree with the parties that North Carolina law governs our interpretation of the relevant policies and exclusions. This is because, "[w]hen hearing a case on appeal for which federal subject matter jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), this Court applies the choice-of-law rules of the state of the district court below," which in this case is North Carolina. *Kenney v. Indep. Order of Foresters*, 744 F.3d 901, 905 (4th Cir. 2014) (citation omitted). North Carolina ordinarily applies "the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy[.]" *Fortune Ins. Co. v. Owens*, 526 S.E.2d 463, 466 (N.C. 2000). Here, the policies were delivered to Beach Mart in North Carolina, so we apply North Carolina's substantive law as well.

Generally, under North Carolina law, an "insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986). Although the duty to indemnify is assessed "by the facts ultimately determined at trial," the duty to defend is "ordinarily measured by the facts as alleged in the pleadings."

---

[2] Like the district court did below, we assume without deciding that L&L's complaint otherwise alleges an advertising injury and thus consider only whether such an injury is barred from coverage under the prior publication exclusions. We do not decide whether any other policy exclusion precludes coverage.

10

*Id.*; *see also Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 692 S.E.2d 605, 610 (N.C. 2010).

To determine whether the pleadings invoke a duty to defend, North Carolina courts apply a "'comparison test,' reading the policies and the complaint 'side-by-side to determine whether the events as alleged are covered or excluded.'" *Harleysville*, 692 S.E.2d at 610 (alterations omitted) (quoting *Waste Mgmt.*, 340 S.E.2d at 378). When reading the complaint, "the facts as alleged . . . are to be taken as true and compared to the language of the insurance policy." *Id.* at 611. If those facts "demonstrat[e] that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." *Waste Mgmt.*, 340 S.E.2d at 377. A contractual duty to defend is triggered even when a complaint includes a "hybrid of covered and excluded events." *Kubit v. MAG Mut. Ins. Co.*, 708 S.E.2d 138, 145 (N.C. Ct. App. 2011) (quoting *Waste Mgmt.*, 340 S.E.2d at 377 n.2). By contrast, the insurer has no duty to defend if "the facts are *not even arguably* covered by the policy." *Waste Mgmt.*, 340 S.E.2d at 378 (emphasis added); *see Harleysville*, 692 S.E.2d at 611.

When construing an insurance policy, North Carolina courts "resolve[] any ambiguity in the words of an insurance policy against the insurance company." *Harleysville*, 692 S.E.2d at 612. Thus, where "possible by reasonable construction," courts "construe[] liberally insurance policy provisions that extend coverage" and "strictly construe against an insurance company those provisions excluding coverage under an insurance policy." *Id.* (citation and quotation marks omitted).

11

Taking L&L's pleadings as true, at least some of Beach Mart's offensive publications occurred prior to coverage, which began on January 1, 2008. Specifically, L&L alleged that, sometime prior to August 29, 2005, Beach Mart violated the parties' oral licensing agreement by using the WINGS trademark to sell beach apparel while refusing to pay for the mark's use. According to L&L, the parties then "negotiated a resolution" to this unauthorized use that was "memorialized in the 2005 Agreement, dated August 29, 2005." J.A. 664, 789. Thus, at least some wrongful publications occurred prior to August 29, 2005, which was before the coverage period.

But under North Carolina law, the insurer's "duty to defend is not excused by [a prior publication exclusion] simply because [publications] amounting to personal or advertising injury [occurred] both before and after the commencement of a policy period." *Kubit*, 708 S.E.2d at 151. Nor is an insurer excused from defending its insured because a pre-coverage publication is "similar" to a post-coverage publication. *Id.* Instead, a prior publication exclusion "bars coverage of an insured's continuous or repeated publication of *substantially the same* offending material previously published at a point of time before a policy incepts." *Id.* (emphasis in original) (quoting *Ringler Assocs. Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1183 (2000)). Accordingly, a prior publication exclusion *will not bar* coverage for "offensive publications [1] made during the policy period [2] which *differ in substance* from those published before commencement of coverage.'" *Kubit*, 708 S.E.2d at 151. (emphasis in original) (quoting *Ringler*, 80 Cal. App. 4th at 1183). The factual allegations in the underlying pleadings satisfy both prongs of this test.

12

First, the pleadings demonstrate that Beach Mart's subsequent publications arguably occurred during the policy period. In particular, L&L alleged that, "[s]ubsequent to December 31, 2005," Beach Mart offensively published the WINGS trademark and advertising slogan to undermine the distinctiveness between its stores and L&L's. J.A. 667, 791. Although the pleadings do not indicate precisely when these publications occurred, January 1, 2008—the date coverage began—is certainly "subsequent" to December 31, 2005. And indeed, Beach Mart did not attempt to terminate the 2005 Agreement for these offensive publications until August 9, 2011—about six years after the agreement was signed and about three years into the coverage period. Making reasonable inferences in Beach Mart's favor, we cannot say these publications are "not even arguably covered by the policy." *Waste Mgmt.*, 340 S.E.2d at 378; *see St. Surfing, LLC v. Great Am. E & S Ins. Co.*, 776 F.3d 603, 611 (9th Cir. 2014) (holding that an underlying complaint did not sufficiently allege that publications occurred prior to coverage—thereby excusing the insurer of its duty to defend—when the policy period began in August 2005 and the complaint vaguely alleged that publications occurred "since at least . . . January of 2005, *or such other date as may later be determined*" (emphasis in original)).

Because the subsequent publications arguably occurred during the policy period, we must next determine whether those publications "differ in substance" from the pre-coverage publications. *Kubit*, 708 S.E.2d at 151. Construing the evidence in the light most favorable to Beach Mart, we conclude that its prior and subsequent publications differ in substance. L&L's pleadings allege that Beach Mart offensively published the WINGS trademark prior to negotiating the 2005 Agreement, which was before coverage. But even

13

though the pleadings identify pre-coverage publications, they provide virtually no indication as to *how* the WINGS mark was published.

Instead, the pleadings summarily assert that Beach Mart violated its oral licensing agreement by using the WINGS mark to sell beach apparel without paying for such use. These assertions provide us with no basis to determine whether the subsequent trademark publications are substantially the same as the trademark publications predating the policy periods or that the subsequent trademark publications caused substantially the same injury as the early publications. Absent such allegations, we cannot say that these subsequent trademark publications are "not even arguably covered by the policy." *Waste Mgmt.*, 340 S.E.2d at 378; *see Kubit*, 708 S.E.2d at 151 (holding that the prior publication exclusion did not apply when an underlying "complaint's allegations did not indicate [whether] the new publications were simply republications of prior statements" or just "similar" to prior statements); *see also Capitol Indem. Corp. v. Elston Self Serv. Wholesale Groceries, Inc.*, 551 F. Supp. 2d 711, 727 (N.D. Ill. 2008) (holding that the prior publication exclusion did not apply when a prior trademark publication did not "cause[] the same injury as the later publication"), *aff'd*, 559 F.3d 616 (7th Cir. 2009); *Maddox v. St. Paul Fire & Marine Ins.*, 179 F. Supp. 2d 527, 530 (W.D. Pa. 2001) (same).

But even if the pre- and post-coverage publications of the WINGS *trademark* were substantially the same, the underlying pleadings identify at least one additional matter that was first published during coverage: the WINGS advertising *slogan*. Notably, the WINGS slogan is distinct from the WINGS trademark and may be afforded separate protections in law. *See Henderson v. U.S. Fid. & Guar. Co.*, 488 S.E.2d 234, 239 (N.C. 1997)

14

(recognizing that "slogan infringement" is a "claim[] which an insured's competitor might assert against it"); *see also Cincinnati Ins. Co. v. Zen Design Grp., Ltd.*, 329 F.3d 546, 557 (6th Cir. 2003) (holding that an insurer had a duty to defend its insured for slogan infringement, even absent a viable trademark infringement claim); *cf. MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 342 (4th Cir. 2001) ("Although in the proper context . . . a slogan[] can serve as a trademark . . . [a] slogan is certainly not by definition a trademark.").[3]   The operative insurance policies recognize this legal distinction by affording trademarks and slogans differing levels of coverage.  Specifically, the policies exclude coverage for injuries arising "out of the infringement of . . . trademark" while also emphasizing that this "exclusion does not apply to infringement . . . of . . . slogan." J.A. 117, 492–93.[4]

L&L also alleged that the subsequent publications gave rise to fresh wrongs distinct from the pre-coverage publications: breach of the 2005 Agreement and breach of the

---

[3] We need not—and thus do not—decide whether the WINGS slogan is actually protected by law because, in North Carolina, "the insurer is bound by the policy to defend 'groundless, false, or fraudulent' lawsuits filed against the insured" as long as "the facts are . . . arguably covered by the policy." *Waste Mgmt.*, 340 S.E.2d at 378; *accord Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1073 (7th Cir. 2004) (recognizing that a "*claim* of advertising injury" gives rise to the duty to defend, not whether a right is "really protected by [state] law" (emphasis in original)).

[4] L&L alleged another advertising injury that occurred subsequent to December 31, 2005: Beach Mart's wrongful construction of the WINGS façade.  The district court also applied the policies' prior publication exclusions to eliminate coverage for that injury, but by its terms, those exclusions only apply to "*oral* or *written* publication of material," not to *building construction*. J.A. 77, 492 (emphases added).  Thus, the plain language of these exclusions—coupled with our duty to strictly construe exclusionary provisions—belies such an expansive reading.

15

implied covenant of good faith and fair dealing. According to L&L, Beach Mart's offensive publications of the WINGS trademark were "contrary to the parties' understanding as reflected in the 2005 Agreement." J.A. 670, 798. And Beach Mart's offensive publication of the WINGS advertising slogan breached its "duty to act in good faith and deal fairly by undermining the distinctiveness of [Beach Mart] and [L&L] as intended by the 2005 Agreement." J.A. 672, 799. These wrongs had to be "fresh" because, at the time of the pre-coverage publications, the 2005 Agreement did not yet exist and thus there was no contract or covenant to breach. Because L&L alleged that these subsequent publications gave rise to distinct, fresh wrongs, we defer to those allegations when determining whether there is a duty to defend. *See Hanover*, 806 F.3d at 768; *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1073–74 (7th Cir. 2004) (recognizing that the "duty to defend is determined by what is charged in the complaint" and therefore holding that a prior publication exclusion did not apply when the underlying "complaint charge[d] the misappropriation of the subordinate ideas as *separate* torts" (emphasis added)).

Even though Beach Mart published new matters causing fresh wrongs during the policy period, the district court nevertheless applied the prior publication exclusions after determining that every publication at issue in the complaint was part of a "common, clearly identifiable advertising objective." *Penn. Nat'l*, 2018 WL 1178004, at *4 (quoting *Hanover*, 806 F.3d at 768). The "common, clearly identifiable advertising objective" approach to determining whether a prior publication exception applies derives from *Hanover*, a 2015 Third Circuit opinion applying Pennsylvania law. *See* 806 F.3d at 768.

16

In crafting its common advertising objective approach, the Third Circuit expressly "buil[t] on" the "'substantially similar'" test the Ninth Circuit applied in assessing the applicability of a prior publication exclusion in an insurance policy governed by California law. *Id.* at 767–68 (quoting *Street Surfing*, 776 F.3d at 612). Given (1) that North Carolina law holds that a prior publication exception applies only if a subsequent publication is "substantially the *same*"—not just "*similar*," *Kubit*, 708 S.E.2d at 151 (emphases added)— and (2) that the Third Circuit's common advertising objective approach expressly "buil[t] on" the Ninth Circuit's already distinguishable substantial similarity test, there is reason to believe that North Carolina courts would not follow the Third Circuit's common advertising objective approach. *Cf. id.* at 151–52 (quoting favorably opinion holding that a prior publication exclusion does not apply if post-coverage publication is "merely 'similar' to [pre-coverage publication] in theme or content" (quoting *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1343 n.5 (S.D. Fla. 2001))).

Even assuming North Carolina courts would adopt such an approach, the pleadings do not command that we infer a common advertising objective here. The Third Circuit identified three non-exhaustive factors to guide the inquiry into whether publications are part of a common advertising objective: (1) "whether the plaintiff charged the insured with separate torts or an agglomeration," (2) whether there is a "significant lull" between publications, and (3) whether the publications share a "common theme relating to the alleged violation." *Hanover Ins.*, 806 F.3d at 768. Even assuming a "common theme" ran through Beach Mart pre- and post-coverage conduct—a question we need not and thus do

17

not decide—the remaining factors identified by the Third Circuit weigh heavily against applying the policies' prior publication exclusions in this case.

To begin, L&L identified distinct wrongs that were caused by the subsequent publications, including, without limitation, breach of the 2005 Agreement and the implied covenant of good faith and fair dealing. Additionally, because Beach Mart used the mark with authorization while the 2005 Agreement remained in effect, a lull of *more than six years* could have passed between the prior and subsequent publications. Although these factors are non-exhaustive, the district court failed to identify any other factor to substantiate its determination that the publications at issue were part of a common advertising objective. Thus, even if North Carolina would preclude coverage for publications that are part of a common advertising objective, the court was not justified in doing so here.[5]

---

[5] Penn National also asserts that Beach Mart's state-law counterclaims were time-barred on statute-of-limitations grounds. Resolving this claim may require the court to consider unbriefed issues involving: (1) choice of law, *compare Kirkpatrick v. Lenoir Cty. Bd. of Educ.*, 216 F.3d 380, 388 (4th Cir. 2000) (recognizing that, under Federal Rule of Civil Procedure 13(a), a "compulsory counterclaim relates back to the date of the original filing") *with Pharmaresearch Corp. v. Mash*, 594 S.E.2d 148, 153 (N.C. Ct. App. 2004) (recognizing that, under state law, counterclaims do not relate back); *see also Aramony v. United Way of Am.*, 969 F. Supp. 226, 234 n.8 (S.D.N.Y. 1997) (framing a similar choice-of-law issue); and (2) equitable tolling, *see, e.g., Aikens v. Ingram*, 524 F. App'x 873, 881-−82 (4th Cir. 2013) (finding equitable tolling "consistent with [North Carolina's] jurisprudence"). The district court errantly applied the prior publication exclusions and thus did not reach these issues, so we decline to consider them in the first instance.

## III.

In sum, the district court erred by applying the prior publication exclusions to eliminate Penn National's duty to defend Beach Mart in the underlying lawsuit. Moreover, because the prior publication exclusions could not eliminate Beach Mart's duty to defend, the court likewise erred in dismissing Beach Mart's counterclaims. Accordingly, we reverse and remand to be reheard before the district judge who will rehear the underlying lawsuit, *Beach Mart v. L&L Wings*, No. 18-1477.

*REVERSED AND REMANDED*
*WITH INSTRUCTIONS*